NOT FOR PUBLICATION

                              UNITED STATES DISTRICT COURT
                                 DISTRICT OF NEW JERSEY

THE BUSINESS EDGE GROUP, INC., :

       Plaintiff,    :
                              Civil Action No. 03-5498(JWB)
     v.               :
                               **O P I N I O N**

CHAMPION MORTGAGE COMPANY,   :
INC.,
                            :

       Defendant.    :

**APPEARANCES**:

    DLA PIPER RUDNICK GRAY CARY
    By:  Steven F. Gooby, Esquire
    379 Thornall Street, 8th Floor
    P.O. Box 2940
    Edison, new Jersey  08837-2226
    (Attorneys for Plaintiff)

    REED SMITH
    By:  Thomas J. Burns, III, Esquire
    Princeton Forrestal Village
    136 Main Street, Suite 250
    Princeton, New Jersey  08543-7839
    (Attorneys for Defendant
    Keybank USA, N.A., improperly
    pleaded as Champion Mortgage
    Company, Inc.)

**BISSELL**, Chief Judge

      This matter comes before the Court on Defendant Champion Mortgage Company's motion for partial summary judgment and Plaintiff The Business Edge Group's motion for summary judgment.

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332.

**FACTS & PROCEDURAL HISTORY**

On October 9, 2003 Plaintiff, The Business Edge Group ("TBEG"), filed a Complaint and Jury Demand naming Champion Mortgage Company, Inc. as a Defendant in a civil action commenced in the Superior Court, Law Division, Middlesex County, New Jersey.  Champion Mortgage Company, Inc. is not a separate legal entity but rather has merged with Key Bank USA, N.A. and is an unincorporated division of Key Bank.  Therefore, Key Bank is the proper Defendant to this action; however, for the purpose of this motion, the Court will refer to Defendant as Champion.  On November 20, 2003 Defendant Champion removed this matter to the United States District Court for the District of New Jersey.

At some time prior to 1998, TBEG acquired the right to use the toll free number 1-800-242-6740 ("the Number").  When the letters on a telephone keypad are used, the Number spells the mnemonic 1-800-champi0[n].  See Pl. 56.1 Statement, ¶ 3. Defendant had reserved for itself the number 1-800-242-6746, which spells the mnemonic "1-800-champio[n]" on a telephone keypad.  The difference between Plaintiff and Defendant's numbers are that the last digit of Plaintiff's number is a zero and the last digit of Defendant's number is a 6, which incidently corresponds to the letter "o" on a telephone keypad.  In 1998,

Plaintiff and Defendant discussed an arrangement whereby Defendant could use the Number to benefit its business.  See Pl. 56.1 Statement, ¶ 6; Def. 56.1 Statement, ¶ 5.  It is alleged that the Number was being misdialed by customers attempting to contact Defendant at 1-800-CHAMPION.  On one occasion, Champion called the Number and discovered that it was being routed to a mortgage company that did not identify itself on the call.  Def. 56.1 Statement, ¶ 6.  On December 28, 1998, the parties entered into a short-term agreement in which Plaintiff would route calls made to the Number to a telephone number for Champion.  Pl. 56.1 Statement, ¶ 7; Def. 56.1 Statement, ¶ 12.  Prior to this agreement, Champion offered to buy the Number from TBEG; however TBEG rejected Champion's offer.  Pl. 56.1 Statement, ¶¶ 9-10; Def. 56.1 Statement, ¶ 10.

In August 1999, the parties entered into a formal Telephone Call Routing Agreement ("the Agreement") under which TBEG provided call routing services for Defendant related to the Number.  Pl. 56.1 Statement, ¶ 13.  During the negotiation of the Agreement, Plaintiff retained a business consultant to analyze the value of the telephone call routing services.  Id. ¶ 14.  The consultant, from Gelt Financial a local mortgage lender and servicing company, analyzed the benefit to Champion of having TBEG route calls made to the Number to Champion's office.  Id. Champion proposed a flat fee figure of $25,000 per month for five

years.  Pl. 56.1 Statement, ¶ 15; Def. 56.1 Statement, ¶ 20.
This figure was based upon Champion's estimated value of the
number and potential telephone calls to the Number.  Def. 56.1
Statement, ¶ 21.  The Agreement states, inter alia,

> *Section 1.*  Routing of the Number to Designated Destination Number.  TBEG shall cause all telephone calls to the Number originating from anywhere within the fifty (50) states of the United States and Puerto Rico (the "Subject Territory") to be routed exclusively to a telephone number designated by Champion in writing to TBEG (the "Designated Destination Number").  The Designated Destination Number as of the date of this Agreement is 973-402-2755.  Champion may change the Designated Destination Number at any time during the Term (as defined in Section 4 of this Agreement) prior to March 31, 2004 by providing written notice to TBEG of its desire to change the Designated Destination Number (a "Change Notice") and, upon its receipt of a Change Notice, TBEG shall take commercially reasonably measures to promptly effect such a change of the Designated Destination Number as set forth in the Change Notice.
>
>> *Section 2.*  Routing Fee: Advance Payment.  In consideration for the services to be provided by TBEG to Champion pursuant to this Agreement, Champion shall pay to TBEG the sum of Twenty-Five Thousand Dollars ($25,000.00) per month (the "Routing Fee") on the first day of each calendar month during the Term (except that, (i) for the month of August 1999, such payment shall be made on the first day of the Term and (ii) for the month[s] of August 1999 and August 2004, the monthly Routing Fee shall be pro-rated based upon the number of days of the Term during such

      months), such that, at the expiration of the Term, Champion shall have paid to TBEG the aggregate sum of One Million Five Hundred Thousand Dollars ($1,500,000.00) (the "Aggregate Routing Fee").

*Section 3.*  <u>Telephone Tolls Charges.</u>  TBEG shall be responsible for and shall pay for all telephone toll charges incurred in connection with the telephone calls made to the Number which are routed to the Designated Destination Number pursuant to this Agreement.  TBEG shall, promptly upon its receipt, forward to Champion the original invoices received by TBEG for telephone company toll charges incurred in connection with the telephone calls made to the Number which are routed to the Designated Destination Number (and TBEG shall retain copies of such invoices for his payment and record-keeping purposes).  TBEG shall indemnify Champion for any and all costs and expenses actually incurred by Champion in the event that telephone toll charges referred to in this Section 3 are unpaid by TBEG and, as a result thereof, Champion makes such payments and, in such event, Champion shall have the right to offset any such amounts actually paid by Champion against the Routing Fee otherwise payable by Champion pursuant to this Agreement.

*Section 4.*  <u>Term.</u>  The term of this Agreement (the "Term") shall commence on the date upon which calls to the Number from within the Subject Territory are, on or after the date hereof, first routed to the Designated Destination Number (the "Commencement Date") and shall terminate on the date which is five (5) years after the Commencement Date.

*Section 5.*  <u>Events of Default: Remedies.</u> Notwithstanding the Term, in the event Champion breaches any of its obligations pursuant to this Agreement, including but not limited to its obligations to pay to TBEG the

-5-

>           Routing Fee set forth in Section 2 of this
>           Agreement, and such breach remains unremedied
>           by Champion thirty (30) days after receipt by
>           Champion of notice of such breach by TBEG
>           (provided, however, that with respect to a
>           breach by Champion of its obligations to pay
>           to TBEG the Routing Fee set forth in Section
>           2 of this Agreement, TBEG shall not be
>           required to provide notice and a right to
>           cure such breach to Champion more than three
>           (3) times in any calendar year), TBEG may
>           terminate this Agreement immediately upon
>           written notice to Champion.  Upon such
>           termination, Champion shall immediately pay
>           to TBEG all monthly Routing Fees otherwise
>           payable to Champion to TBEG pursuant to
>           Section 2 of this Agreement such that, upon
>           the date of such termination, Champion shall
>           have paid to TBEG the Aggregate Routing Fee.
>           In addition to and not in limitation of the
>           foregoing, upon the breach of this Agreement
>           by Champion, TBEG shall have any and all
>           rights and remedies otherwise available to it
>           under this Agreement or under law and
>           Champion shall indemnify TBEG for any and all
>           costs, expenses and/or damages (including
>           reasonable attorneys' fees) incurred by TBEG
>           as a result of any breach by Champion of any
>           of its representations, warranties, covenants
>           or agreements contained in this Agreement or
>           the enforcement by TBEG of any of its rights
>           under this Agreement.

See The Agreement, Attached to Decl. of Sheldon Kass, Ex. C.

From August 1999 through December 2002, TBEG and Champion performed in compliance with their respective duties and obligations provided for in the Agreement.  Pl. 56.1 Statement, ¶ 32.  On August 1, 2002, an e-mail about the Agreement was sent from Steve Ives, Vice President of Finance at Champion, to other employees of Champion, including Champion's President, Jim Goryeb.  It stated, inter alia,:

-6-

> Here is what I remember about this ... A couple of years ago, this company had a phone number that was very close to ours (they substituted a zero for the letter "o" in Champion). They came to Dan Rich with phone reports showing the volume of calls. We signed a contract to pay them $25K/month for 60 months (ends a year and a half from now) so that they would direct calls from their number to ours.
>
> We do have recent phone reports showing that they direct 300-400 calls to us monthly (this seems high), and we have validated that we have at least a small volume of leads and fundings from the source. (Very hard to validate what we would have gotten anyway – from people simply redialing correct number).
>
> We could (1) continue with the remaining months of our contract and then renogiating [sic] to keep the phone number, (2) simply pay out the remaining term, (3) stop all payments (contract break), (4) stop and pursue recovery of past monies. Given our recent web success, I'm feeling more aggressive about this.

<u>See</u> August 1, 2002 E-mail, Attached to Declaration of Steven F. Gooby ("Gooby Decl."), Ex. A. Approximately two weeks later, the following e-mail was drafted by Steve Ives. It states, in relevant part:

> My initial thought in sending the first message, was yes, we do have a contract. Our only real argument is that the guy's basic business practice is dishonest and therefore we won't honor it. He presented a bunch of data around how many calls he was getting and "scared" us into the agreement. As we have learned more about our customers[] behavior we now believe we would get the majority of that business anyway.
>
> It is not clear cut. We would stop paying,

-7-

>       he would threaten to sue, he might actually
>       sue, we might win/lose.

See August 4, 2002 E-mail, Attached to Gooby Decl., Ex. A.

On December 12, 2002 and January 7, 2003 counsel for Champion notified TBEG via letter that Defendant would no longer comply with its duties and obligations under the Agreement.[1]  The letters, which were identical, stated that the Defendant "submits that the Agreement constitutes the unlawful brokering of a toll free telephone number in violation of federal law and, as such, was void ab initio."  Accordingly, Defendant refused to make any further payments to Plaintiff and demanded restitution for all amounts previously paid, totalig $1,026,189.44.  See December 12, 2002 and January 7, 2003 Letters, Attached to Gooby Decl., Exs. P and Q.  The letters also requested that, "to the extent that TBEG no longer needs to use the Number in connection with TBEG's own business, which does not include the sale, lease or barter of the Number to Champion or to any other person or entity, TBEG transfer the Number and underlying telephone service to Champion in accordance with the applicable provision of the BOC[2] Tariff, or disconnect such underlying telephone service and return the

---

[1] Plaintiff claims that due to a change of its business address around the time of the correspondence, it never received the December 12, 2002 letter.

[2] Bell Operating Companies

Number to the SMS[3] Database for assignment to other toll free subscribers."  Id.  The letters further stated that "[i]n the event that TBEG were to agree to transfer the Number and its underlying telephone service to Champion in accordance with the provisions of the BOC Tariff, Champion would be willing to permit TBEG to offset its reimbursement to Champion by the sum of $1,000 to cover any administrative costs incurred by TBEG to make such transfer.  Additionally, Champion would be willing to work with TBEG and its serving carrier to make such transfer of TBEG's toll free telephone service."  Id.  Champion alleges that from August 1999 through April 2003, TBEG routed an average of 440 calls per month from the Number to Champion and that the average call usage per month was approximately 2100 minutes, with the average charge per month for call usage of $210.02.  Def. 56.1 Statement, ¶¶ 31-32.

By letter dated January 28, 2003, Plaintiff's counsel refuted the conclusions drawn in Defendant's letters and declined Defendant's offer to transfer the Number.  See January 28, 2003 Letter, Attached to Gooby Decl, Ex. R.  For several months following the exchange of letters, Defendant continued to pay Plaintiff and Plaintiff continued to provide call routing service to Defendant.  Pl. 56.1 Statement, ¶ 48.  As of May 2003, however, Defendant ceased making payments to Plaintiff.  Id. ¶

---

[3] Service Management System

50. Plaintiff continued to perform its obligations under the Agreement from May 2, 2003 until June 2, 2003. Id. ¶ 50.

On May 30, 2003, Plaintiff notified Defendant of the breach. Pl. 56.1 Statement, ¶ 51. As of June 2, 2003, Defendant had not cured its default under the Agreement and Plaintiff terminated the Agreement. Id. ¶ 52. Subsequently, TBEG instituted the instant litigation seeking the unpaid amount under the Agreement totaling at least $375,000.00, together with attorneys' fees, costs and interest. See Compl., Count One. Defendant Champion filed a counterclaim seeking $1,125,000.00, the approximate sum which Defendant had paid Plaintiff from late 1999 through early 2003. See Answer & Counterclaim.

## DISCUSSION

### I. Standard for Summary Judgment

Federal Rule of Civil Procedure 56(c) provides that summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Chipollini v. Spencer Gifts, Inc., 814 F.2d 893, 896 (3d Cir. 1987) (en banc), cert. dismissed, 483 U.S. 1052 (1987). In deciding a motion for summary judgment, a court must view the facts in the light most favorable to the nonmoving party and must

-10-

resolve any reasonable doubt as to the existence of a genuine issue of fact against the moving party. <u>Continental Ins. Co. v. Bodie</u>, 692 F.2d 436, 438 (3d Cir. 1982). The moving party has the burden of establishing that there are no genuine issues of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-24 (1986).

The Supreme Court has stated that, in applying the criteria for granting summary judgment:

> the judge must ask ... not whether ... the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented. The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the [non-movant] is entitled to a verdict.

<u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 252 (1986). A fact is "material" only if it will affect the outcome of a lawsuit under the applicable law, and a dispute over a material fact is "genuine" if the evidence is such that a reasonable fact-finder could return a verdict for the nonmoving party. <u>Id</u>.

**II. <u>Application</u>**

One issue in the instant motion is whether the Agreement represented an illegal contract for the sale of a toll free telephone number or whether it is a valid and enforceable

contract for the routing of telephone calls made to a toll free telephone number. No one has a property interest in a phone number. See 47 C.F.R. § 52.107 (1997). Section 52.107 states:

> § 52.107 Hoarding.
>
> (a) As used in this section, hoarding is the acquisition by a toll free subscriber from a Responsible Organization of more toll free numbers than the toll free service. The definition of hoarding also includes number brokering, which is the selling of a toll free number by a private entity for a fee.
>
> (1) Toll free subscribers shall not hoard toll free numbers.
>
> (2) No person or entity shall acquire a toll free number for the purpose of selling the toll free number to another entity or to a person for a fee.
>
> (3) Routing multiple toll free numbers to a single toll free subscriber will create a rebuttable presumption that the toll free subscriber is hoarding or brokering toll free numbers.
>
>> (b) Tariff Provision. The following provision shall be included in the Service Management System tariff and in the local exchange carriers' toll free database access tariffs:
>>
>> [T]he Federal Communications Commission ("FCC") has concluded that hoarding, defined as the acquisition of more toll free numbers than one intends to use for the provision of toll free service, as well as the sale of a toll free number by a private entity for a fee, is contrary to the public interest in the conservation

-12-

> of the scarce toll free number resource and contrary to the FCC's responsibility to promote the orderly use and allocation of toll free numbers.

Defendant Champion argues that TBEG's "actions, from the time it reserved the right to use and service the Number, to the point where Champion agreed to pay TBEG $25,000 per month to use the Number, illustrates TBEG's intention, and ultimate success, in charging Champion for the value of the Number to Champion's business, as opposed to charging Champion for the cost of its toll-free services."  Def. Opp'n at 4.  To the contrary, Plaintiff TBEG contends that its agreement with Champion "required TBEG to route calls made to the Number, using its own equipment and technology, to another number designated by Champion, so those calls could be answered by Champion personnel. The Number itself was not transferred, nor did Champion gain possession or control over the Number."  Pl. Opp'n at 5-6. Furthermore, TBEG asserts that "Champion's payment to TBEG was a fee for the call routing service of a particular toll-free number, not a royalty or other payment for the value of a telephone number."  Id. at 6.  To support its position, Plaintiff TBEG relies on a Seventh Circuit decision, Jahn v. 1-800-Flowers.com, Inc., et al., 284 F.3d 807 (7th Cir. 2002).  In Jahn a Corporation and its principal, which had sold a toll-free telephone number that spelled 800-FLOWERS to a company engaged in

-13-

telephone floral sales, brought suit for breach of an agreement calling for royalty payments arising from the use of the number. The District Court dismissed the action finding that the sale of the toll-free number was prohibited by 47 C.F.R. § 52.107. The Court of Appeals for the Seventh Circuit reversed, holding that the FCC regulation forbidding the sale of telephone numbers does not proscribe sales that occurred prior to the adoption of that regulation in 1997. In the course of its opinion the Seventh Circuit stated:

> The Federal Communications Commission has not made it clear whether every transfer for value is a form of "number brokering" even when the transfer does not entail any of the events listed in subsections (a)(1) through (a)(3); the regulation does not contain the word "all" and thus its scope is open to question. To say "A includes B" is not necessarily to say "all B is A." Many firms transfer their phone numbers to their successors (or to ventures spun off into subsidiaries) in order to preserve the good will and custom of the business. The regulation shows that phone numbers cannot be treated like Internet domain addresses, which regularly are sold outright for a fee, but it does not show that all transfers to new ventures are forbidden; it would not make much sense to have numbers with economic value (such as 800-FLOWERS) perpetually assigned to businesses (such as transportation brokers) that cannot realize this value. Moving assets to higher and better uses is an important goal of any economic system. Drawing a line between these normal and lawful transactions and forbidden "hoarding" or "number brokering" would be a job for the FCC, not for the courts, at least as an initial matter. But we need not send this issue to the Commission

> under the doctrine of primary jurisdiction, because it is possible to resolve this case on the assumption that all sales are "number brokering."

Jahn, 284 F.3d at 810.

In the case at bar, this Court acknowledges that there has not been a technical "sale" of the number. The inquiry does not end here, however, for although there was no "sale" of the number, the activities which transpired prior to and during the term of the Agreement support the position that the Agreement was not simply compensation for a routing service.

At his deposition, Sheldon Kass, the founder of TBEG, testified that his company targeted the telephone number 1-800-242-6740 because the company "felt that that would be a useful number" because it spelled the word "champion." Kass Dep., 41:23-44:5, Attached to Gooby Decl., Ex. F. Mr. Kass then testified that someone from Champion contacted him and "wanted to know if we had this number and if they could have it." Id. 50:17-51:4. Shortly thereafter Mr. Kass met with representatives of Champion and a trial period for the usage of the number was discussed. Id. 52:2-56:5. The price for the routing services which was outlined in the first agreement was as follows: ten cents per minute for each call and $3.00 for all unique calls. Id. 56:6-19. Mr. Kass explained that a "unique call" refers to the first call a person makes to the number. Id. 56:20-57:12.

At the conclusion of the trial period, TBEG and Champion

-15-

representatives discussed a more permanent arrangement. Mr. Kass testified that prior to drafting a long term agreement, he suggested "we bring in a third party who could give us a reasonable [] value." Id. 82:20-25. Mr. Kass then contacted an entity in the mortgage business, Gelt Financial, and sought advice "about values or whatever would be sensible for this relationship." Id. 84:12-16. According to Mr. Kass, he asked Gelt Financial to value the relationship between his company and Champion with respect to the Number. Gelt Financial gave Mr. Kass "a value of the phone calls" to Champion based on TBEG's records. Mr. Kass testified that he thinks that the value was $50 a call. Id. 84:25-86-7. This testimony from Mr. Kass contradicts TBEG's position on this motion for summary judgment that "Champion's payment to TBEG was a fee for the call routing service of a particular toll-free number, not a royalty or other payment for the value of a telephone number." Pl. Opp'n at 6.

    Because the record reflects the motivation of the parties to obtain a valuation of the number in question as it pertained to Champion's business, the interpretation and enforceability of the Agreement is no longer purely a legal question. From the information contained in the record, it is possible to conclude that the Agreement encompassed the value of the Number and not simply the routing fees associated with the transfer of the calls to the Number. Accordingly, because there are factual issues

which are still in dispute, this Court cannot, as a matter of law, determine whether this Agreement violates 47 C.F.R. § 52.107.  Without first determining the nature of the Agreement and the charges associated with it, this Court cannot reach a conclusion as to whether the fees charged by TBEG were or were not illegal "number brokering."[4]

## CONCLUSION

    For the foregoing reasons, the cross-motions for summary judgment are denied.

/s/   John W. Bissell
JOHN W. BISSELL
Chief Judge
United States District Court

DATED:  August 29, 2005

---

[4] In reaching this conclusion, the Court expresses no opinion as to whether any term of the Agreement is ambiguous.  If that issue arises at a later point in this litigation, it can be addressed at that time.