<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

THE BUSINESS EDGE GROUP, INC.,  :
            :   Civil Action No. 03-5498(SDW)
            :
      Plaintiff,     :
            :
v.             :
            :
CHAMPION MORTGAGE COMPANY, :   **OPINION**
INC.,           :
            :
            :   December 6, 2006
      Defendant.    :
            :

**WIGENTON,** District Judge.

  Before this Court are Defendant's Motions In Limine to transfer this matter to the Federal Communication Commission ("FCC") based on the doctrine of primary jurisdiction or in the alternative for a finding that the contract entered into between the parties is illegal and void <u>ab initio</u> and therefore Defendant's obligation under that contract for outstanding payments is relieved and for their restitution of past payments.

  This matter was scheduled for a bench trial on November 14, 2006, but all parties, including the Court, agree that there are no issues of material fact which exist and thus this Court can rule on this matter by way of summary judgment. Accordingly, this Court converts these motions into a summary judgment application sua sponte. For the reasons set forth below, Defendant's motions are denied and granted in part.

1

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332.

## I.   **BACKGROUND**[1]

On October 9, 2003 Plaintiff, The Business Edge Group ("TBEG") filed a Complaint and Jury Demand naming Champion Mortgage Company, Inc. as a Defendant in a civil action brought in the Superior Court, Law Division, Middlesex County, New Jersey.[2]  On November 20, 2003 Defendant Champion removed this matter to the United States District Court for the District of New Jersey.

Sometime prior to 1998, Plaintiff TBEG acquired the right to use the toll free number 1-800-242-6740 ("the Number").  When the letters on a telephone keypad are used, the Number spells the mnemonic 1-800-champi0[n].  Defendant has reserved for itself 1-800-242-6746, which spells the mnemonic 1-800-champio[n].  The difference between the two numbers are that the last digit of Plaintiff's number is a zero and that of defendant is a 6, which corresponds to the letter "o" on a telephone keypad.

In 1998, Plaintiff and Defendant discussed an arrangement whereby Defendant could use the Number to benefit its business.  It is alleged that the Number was being mis-dialed by customers attempting to contact Defendant at 1-800-CHAMPION.  On one occasion, Champion

---

[1]  Unless otherwise stated, the facts herein are adopted from the District Court's August 29, 2005 Opinion Denying Motions for Summary Judgment and the parties' Joint Pre-Trial Order, Statement of Stipulated Facts, dated May 16, 2006.

[2]  Champion Mortgage Company, Inc. is not a separate legal entity but has merged with Key Bank USA, N.A. and is an unincorporated division of Key Bank.  Therefore, Key Bank is the proper Defendant in this matter; however, for purposes of these motions, the Court will refer to the Defendant as Champion.

called the Number and discovered that it was being routed to a mortgage company that did not

identify itself on the call.  On December 28, 1998, the parties entered into a short term agreement

("initial agreement") in which Plaintiff would route calls made to the Number to a telephone

number for Champion. The terms of that initial agreement were as follows:

2.     AGREEMENT OF THE PARTIES

    a.     TBEG agrees to cause all telephone calls dialed to the telephone number, 1 800 242-6740 (NUMBER) to be routed to the telephone number [ ], which has been designated by CHAMPION.  CHAMPION can change this "destination" number whenever they choose.

    b.     TBEG agrees to cause such routing to begin on or before December 31, 1998.

    c.     At the conclusion of each month, TBEG will present three reports to CHAMPION.

            The First Report will be the report from the Carrier.
            The Second Report will show each call made to NUMBER.  For each call, the report will contain the date, time called from number and the call duration.
            The Third Report will contain a tabulation of unique calls made to Number.

    d.     CHAMPION agrees to pay to TBEG a fee each month.
        The fee amount is $.10 per minute for all the calls in "The Second Report" above c.

                    plus
        $3.00 for all the unique calls in "The Third Report" above @ (sic).

    e.     CHAMPION has Right of First Refusal before this number can be forwarded to another destination.  CHAMPION shall exercise their Right of First Refusal by notifying TBEG in writing of their intention to continue to use the NUMBER for another three month period.  Should CHAMPION not exercise their RIGHT of FIRST REFUSAL within the 30 days prior to the termination of this agreement the Right of First Refusal shall be deemed waived.

    f.     CHAMPION will select which calls are routed to the "destination number".  The attached "Area Code List" is they (sic) way this selection is

3

made.  Only calls made from the selected area codes will be routed to the destination number and only those calls will appear on the CHAMPION reports and invoice.

g.      This Agreement shall terminate March 31, 1999.

(Certification of Thomas J. Burns, III Esq. In Support of Defendant Champion Mortgage Company's Motion in Limine to Transfer this Action to the FCC or, in the alternative, for Summary Decision, Exhibit C.)

While the initial agreement was for a three month period, this agreement was extended at least once and was in effect for approximately eight months, from January 1999 to July 1999. Sometime after TBEG began routing calls under the 1998 agreement, Champion offered to buy the number from TBEG.[3]  TBEG rejected Champion's offer.  Thereafter, the parties began discussing a longer term relationship.

In August 1999, the parties entered into a Telephone Call Routing Agreement ("the Agreement") under which TBEG provided call routing services for Defendant related to the Number.  During the negotiations of the Agreement, Plaintiff retained a business consultant to analyze the value of the telephone call routing services to be provided by TBEG to Champion. The consultant, from a local mortgage lender and servicing company called Gelt Financial, analyzed the benefit to Champion of having TBEG route calls made to the number to Champion's office.  After reviewing materials submitted by Gelt Financial and doing their own due diligence, Champion offered to pay TBEG a flat fee of $25,000 per month for the five year

---

[3]  This Court notes the conflict with the May 16, 2006 Opinion of John W. Bissell, U.S.D.J., who found the offer to buy the number occurred prior to the initial agreement.  See Opinion Denying Motions for Summary Judgment at 3.  The parties' Stipulated Facts indicate the offer occurred after the initial agreement was executed but prior to execution of the Agreement. For purposes of these motions it is of no moment when this offer occurred.

term of the Agreement, which TBEG accepted. This figure was based upon Champion's estimated value of the number and potential telephone calls to the Number, which was derived from Gelt Financial's analysis, who opined that each call to the Number had approximately a fifty dollar ($50) value to Champion.[4]  During the negotiation of the Agreement, Champion calculated a proposed monthly fee based upon the estimated revenue that could possibly be generated by telephone calls to the Number.

In 1998, certain Champion employees negotiated with TBEG regarding the initial agreement. These were Cindy Engrassia, Marketing Manager, and Dan Rich, Senior Vice President and Chief Financial Officer. These two individuals negotiated with Sheldon Kass, President of TBEG. These same individuals negotiated the Agreement as well.  In October 2001, Dan Rich resigned from or otherwise terminated his employment with Champion.  Cindy Engrassia (Stancavish) also left Champion that same year.

Champion alleges that from August 1999 through April 2003, TBEG routed an average of 440 calls per month from the Number to Champion and that the average call usage per month was approximately 2100 minutes, with the average charge per month for call usage of $210.02. (Burns Cert. ¶ 11.)  From January 1999 through July 1999, the Number received an average of 402 unique calls per month and Champion paid TBEG an average of $1,206 per month for those calls.  (Id. at ¶ 5.)  Also during that time period, there was an average of 2,796 call minutes per month for the Number; and Champion paid TBEG an average of $335.52 per month for those minutes.  (Id.)  Champion estimated that it would receive approximately 400 calls per month and

---

[4] Neither of the parties submitted any documentation from Gelt Financial in their *in limine* submissions.

that of those calls, approximately 5% (20 calls) would result in loan fundings. (Id. at Exh. B,

Deposition Transcript of Cynthia Stancavich, dated July 22, 2005 at 50:1 to 52:19.) Champion

assigned a value of $1,250 for each of the 20 calls resulting in a loan funding; hence the monthly

payment figure of $25,000. (Id.; see Final Pre-Trial Order, Stipulation of Facts #s 19-20, p. 8.)

Both parties had the benefit of legal counsel throughout the negotiations and execution of

the Agreement. The Agreement provides in relevant part:

> *Section 1*. Routing of the Number to Designated Destination Number. TBEG
> shall cause all telephone calls to the Number originating from anywhere within
> the fifty (50) states of the United States and Puerto Rico ("the Subject Territory")
> to be routed exclusively to a telephone number designated by Champion in
> writing to TBEG (the "Designated Destination Number"). The Designated
> Destination Number as of the date of this Agreement is 973-402-2755. Champion
> may change the Designated Destination Number at any time during the term (as
> defined in Section 4 of this Agreement) prior to March 31, 2004 by providing
> written notice to TBEG of its desire to change the Designated Destination Number
> (a "Change Notice") and, upon its receipt of a change notice, TBEG shall take
> commercially reasonably measures to promptly effect such a change of the
> Designated Destination Number as set forth in the Change Notice.
>
> *Section 2*. Routing Fee: Advance Payment. In consideration for the services to be
> provided by TBEG to Champion pursuant to this Agreement, Champion shall pay
> to TBEG the sum of Twenty-Five Thousand Dollars (25,000) per month (the
> "Routing Fee") on the first day f each calendar month during the term (except that
> (I) for the month of August 1999, such payment shall be made on the first day of
> the Term and (ii) for the month[s] of August 1999 and August 2004, the monthly
> Routing Fee shall be prorated based upon the Number of days of the Term during
> such months), such that, at the expiration of the Term, Champion shall have paid
> to TBEG the aggregate sum of One Million Five Hundred Thousand Dollars
> ($1,500,000.00) (the "Aggregate Routing Fee").
>
> *Section 3*. Telephone Tolls Charges. TBEG shall be responsible for and shall pay
> for all telephone toll charges incurred in connection with the telephone calls made
> to the Number which are routed to the Designated Destination Number pursuant
> to this Agreement. TBEG shall, promptly upon its receipt, forward to Champion
> the original invoices received by TBEG for telephone company toll charges
> incurred in connection with the telephone calls made to the Number which are
> routed to the designated Destination Number (and TBEG shall retain copies of

6

such invoices for his payment and record-keeping purposes).  TBEG shall indemnify Champion for any and all costs and expenses actually incurred by Champion in the event that telephone toll charges referred to in this Section 3 are unpaid by TBEG and, as a result thereof, Champion makes such payments and, in such event, Champion shall have the right to offset any such amounts actually paid by Champion against the Routing Fee otherwise payable by Champion pursuant to this Agreement.

*Section 4.*  Term.  The term of this Agreement (the "Term") shall commence on the date upon which calls to the Number from within the Subject Territory are, on or after the date hereof, first routed to the Designated Destination Number (the "Commencement Date") and shall terminate on the date which is five (5) years after the Commencement Date.

*Section 5.*  Events of Default: Remedies.  Notwithstanding the Term, in the event Champion breaches any of its obligations pursuant to this Agreement, including but not limited to its obligation to pay to TBEG the Routing Fee set forth in Section 2 of this Agreement, and such breach remains unremedied by Champion thirty (30) days after receipt by Champion of notice of such breach by TBEG (provided, however that with respect to a breach by Champion of its obligations to pay to TBEG the Routing Fee set forth in Section 2 of this Agreement, TBEG shall not be required to provide notice and a right to cure such breach to Champion more than three (3) times in any calendar year), TBEG may terminate this Agreement immediately upon written notice to Champion.  Upon such termination, Champion shall immediately pay to TBEG all monthly Routing Fees otherwise payable to Champion to TBEG pursuant to Section 2 of this Agreement such that, upon the date of such termination, Champion shall have paid to TBEG the Aggregate Routing Fee.  In addition to and not in limitation of the foregoing, upon the breach of this Agreement by Champion, TBEG shall have any and all rights and remedies otherwise available to it under this Agreement or under law and Champion shall indemnify TBEG for any and all costs, expenses and/or damages (includinf reasonable attorney's fees) incurred by TBEG as a result of any breach by Champion of any of its representations, warranties, covenants or agreements contained in this agreement or the enforcement by TBEG of any of its rights under this Agreement.

(Burns Cert., Exh. E.)

From August 1999 through December 2002, TBEG and Champion performed in compliance with their respective duties and obligations provided for in the Agreement.

On August 1, 2002 an email about the Agreement was sent from Steve Ives, Vice

7

President of Finance at Champion, to other employees of Champion, including Champion's

President, Jim Gorycb. It stated:

> Here is what I remember about this . . . A couple of years ago, this company had a
> phone number that was very close to ours (they substituted a zero for the letter "o"
> in Champion). They came to Dan Rich with phone reports showing the volume of
> calls. We signed a contract to pay them $25k/month for 60 months (ends a year
> and a half from now) so that they would direct calls from their number to ours.
>
> We do have recent phone reports showing that they direct 300-400 calls to us
> monthly (this seems high), and we have validated that we have at least a small
> volume of leads and funding from the source. (Very hard to validate what we
> would have gotten anyway - from people simply redialing correct number).
>
> We could (1) continue with the remaining months of our contract and then
> renegotiating to keep the phone number, (2) simply pay out the remaining term (3)
> stop all payments (contract break), (4) stop and pursue recovery of past monies.
> Given our recent web success, I'm feeling more aggressive about this.

Approximately 2 weeks later, the following e-mail was drafted by Steve Ives. It states:

> My initial thought in sending the first message, was yes, we do have a contract.
> Our only real argument is that the guy's basic business practice is dishonest and
> therefore we won't honor it. He presented a bunch of data around how many calls
> he was getting and "scared" us into the agreement. As we have learned more
> about our customers [] behavior we now believe we would get the majority of that
> business anyway.
>
> It is not clear cut. We would stop paying, he would threaten to sue, he might
> actually sue, we might win/lose.

On December 12, 2002 and January 7, 2003 counsel for Champion notified TBEG via

letter that Defendant would no longer comply with its duties and obligations under the

Agreement.[4] The letters, which were identical, stated that the Defendant "submits that the

Agreement constitutes the unlawful brokering of a toll free telephone number in violation of

---

[4] Plaintiff claims that due to a change in its business address around the time of the
correspondence, it never received the December 12, 2002 letter.

federal law and, as such, was void ab initio." Accordingly, Defendant refused to make any further payments to Plaintiff and demanded restitution for all amounts previously paid, totaling $1,026,189.44. The letters also requested that, "to the extent that TBEG no longer needs to use the Number in connection with TBEG's own business, which does not include the sale, lease or barter of the Number to Champion or to any other person or entity, TBEG transfer the Number and underlying telephone service to Champion in accordance with the applicable provision of the BOC Tariff, or disconnect such underlying telephone service and return the number to the SMS Database for assignment to other toll free subscribers." The letter further stated that "[i]n the event that TBEG were to agree to transfer the Number and its underlying telephone service to Champion in accordance with the provisions of the BOC Tariff, Champion would be willing to permit TBEG to offset its reimbursement to Champion by the sum of $1,000 to cover any administrative costs incurred by TBEG to make such transfer. Additionally, Champion would be willing to work with TBEG and its serving carrier to make such transfer of TBEG's toll free telephone service."

By letter dated January 28, 2003, Plaintiff's counsel refuted the conclusions drawn in Defendant's January 2003 letter and declined Defendant's offer to transfer the Number. For several months following the exchange of letters, Defendant continued to pay Plaintiff and Plaintiff continued to provide call routing service to Defendant. As of May 2003, Defendant ceased making payments to Plaintiff.

Plaintiff continued to perform its obligations under the Agreement from May 2, 2003 until June 2, 2003. On May 30, 2003, Plaintiff notified Defendant of the breach. As of June 2, 2003, Defendant had not cured its default under the Agreement and Plaintiff terminated the

9

Agreement. Subsequently, TBEG instituted the instant litigation seeking the unpaid amount

under the Agreement totaling at least $375,000 together with attorney's fees, costs and interest.

Defendant Champion filed a counterclaim seeking $1,125,000, the approximate sum which

Defendant had paid Plaintiff from late 1999 through early 2003.


## II.    LEGAL STANDARD

### A.    *Summary Judgment*

Summary judgment shall be granted "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." Fed. R. Civ. P. 56(c).  A factual dispute is genuine if a reasonable jury could

return a verdict for the non-movant and it is material if, under the substantive law, it would affect

the outcome of the suit.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Once the moving party meets its initial burden, the burden then shifts to the non-movant

who "may not rest upon the mere allegations or denials of [its] pleading, but the [non-movant's]

response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing

that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).  "If the [non-movant] does not so

respond, summary judgment, if appropriate, shall be entered against the [non-movant]." Fed. R.

Civ. P. 56(e).  The court may not weigh the evidence and determine the truth of the matter.

Anderson, 477 U.S. at 249.  All justifiable inferences of the non-moving party are to be drawn in

his favor.  Id. at 255 (citation omitted).

In the instant matter, it is undisputed by both parties that there are no genuine issues of

10

material fact. Accordingly, the purely legal question is whether the Agreement violates the 1997
regulation, and, if so, the effect of that Agreement on the parties.

## III   DISCUSSION

### A.   Transferring this Matter to the FCC

By way of *in limine* motion, Defendant argues that the determination of whether the
Agreement is valid should be resolved by the FCC under the doctrine of primary jurisdiction.
This court disagrees.

The doctrine of primary jurisdiction "requires a court to transfer an issue within a case
that involves expert administrative discretion to the federal administrative agency charged with
exercising that discretion for initial decision." Richman Bros. Records v. Sprint, 953 F.2d 1431,
1435, n.3 (citations omitted) (3d. Cir. 1991), *cert denied*, 505 U.S. 1230 (1992). The doctrine
applies "where a claim is originally cognizable in the courts, and comes into play whenever
enforcement of the claim requires resolution of issues which, under a regulatory scheme, have
been placed with the special competence of an administrative body." MCI Telecommunications
Corp. v. Teleconcepts, Inc., 71 F.3d 1086, 1103 (citation omitted) (3d Cir. 1995), *cert denied*,
519 U.S. 815 (1996).

However, not every case that involves an issue falling within the expertise of an agency is
subject to primary jurisdiction and "[c]ourts should not be too hasty in referring a matter to an
agency, or to develop a 'dependence' on the agencies whenever a controversy remotely involves
some issue falling arguably within the domain of the agency's 'expertise'." Id. at 1104. If a
court is equally well suited to resolve the issue, the case need not be transferred. Id.

11

No complex matter has been presented to the court upon which it would be unable to render a determination or would require the FCC's peculiar competence to reach a determination. Resolution of the Agreement's legality is not an issue that requires resolution by the FCC, as a court may determine this issue "because it is possible to resolve this case on the assumption that all sales are number brokering".  Jahn v. 1-800-FLOWERS.COM, Inc., et al., 284 F.3d 807, 810 (7th Cir. 2003), *cert denied*, 537 U.S. 882 (2002).  In Jahn, the court determined there was a sale of the toll free number and therefore it could decide the issue of whether the royalty payments violated the FCC regulation.  Id.  If this case can be resolved, then, by answering the question of whether the Agreement constituted a sale, this court can resolve the issue.

As will be discussed, infra, because this court finds the transfer of the number to Champion under the five year Agreement constituted a sale as a matter of law, because it was number brokering, the Court denies Defendant's *in limine* motion to transfer this matter to the FCC.  This matter is now ripe for disposition by way of summary judgment proceedings as there are no factual issues in dispute, only legal questions.

### B.      The Agreement Constitutes the Sale of a Toll Free Number

In 1997, the FCC proscribed the hoarding or sale of toll free numbers.  47 C.F.R. § 52.107(a).  Hoarding is the "acquisition by a toll free subscriber . . . of more toll free numbers than the toll free subscriber intends to use for the provision of toll free service.  The definition of hoarding also includes number brokering, which is the selling of a toll free number by a private entity for a fee."  Id.  The regulation further provides that "[n]o person or entity shall acquire a toll free number for the purpose of selling the toll free number to another entity or to a person for

12

a fee".  47 C.F.R. § 52.107(a)(2).  Further, the FCC has concluded that hoarding and selling toll free numbers "is contrary to the public interest in the conservation of the scarce toll free number resource and contrary to the FCC's responsibility to promote the orderly use and allocation of toll free numbers."  47 C.F.R. § 52.107(b).

It is undisputed that entering into a contract for the sale of a toll free number is violative of 47 C.F.R. § 52.107.  However, this case does not involve the per se sale or hoarding of a toll free number.  The Agreement entered into by the parties and at issue in this litigation refers to the contract as one for "routing" services.  The word 'sale' or 'sell' is never used in the Agreement and plaintiff contends the contract was for routing services.  Therefore, the issue in this case is whether the Agreement for routing services constitutes, or otherwise rises to the level of, a sale.

Jahn involved the sale of a toll free number that was transferred to the company 800-FLOWERS.  Jahn, supra, 284 F.3d at 808-09.  By way of an Agreement executed prior to the 1997 regulation, plaintiff, the former subscriber, took a royalty interest in revenues derived from the phone sales.  Id. at 809.  Plaintiff instituted suit when defendant ceased making his royalty payments.  Id.  On appeal, the circuit court ruled that the 1997 regulation was not retroactive and that because the agreement predated the regulation, defendants had to continue their payments to Jahn.  Id. at 812.

As in Jahn, the Agreement constitutes a "sale" of a toll free number and is violative of the 1997 regulation as a matter of law.  This is evident upon a review of: (1) TBEG President Sheldon Kass's deposition testimony; (2) the hiring and findings of Gelt Financial; and (3) comparisons between the initial agreement and the Agreement.

13

### (1) TBEG President Sheldon Kass

The President of TBEG, Sheldon Kass', deposition testimony supports the conclusion that this was the sale of a toll fee number, and not merely a contract for routing services. Mr. Kass specifically targeted and obtained the Number because he felt it would be "useful" as it had certain spellings associated with it - such as CHAMPION. (Deposition Transcript of Sheldon Kass, dated July 15, 2006 at 42:8 to 43:9.) This was not the only time TBEG acquired toll free numbers and provided routing services, as TBEG was in fact formed by Mr. Kass in 1992 - 1993 to offer routing services to potential customers. Id. at 16:18-22 & 21:8-12. TBEG itself also used the Number, initially testing it to see what numbers came in. Id. at 49:24 to 50:7. Clearly, TBEG realized the potential business value this number had - particularly to Champion. More importantly, Mr. Kass hired Gelt Financial to evaluate the business relationship between the parties and Gelt Financial assigned a value of $50 per call for each call. Id. at 82:16 to 85:12 & 86:5-7. While TBEG argues this is a routing services agreement and not a sale, Champion is the only customer to ever pay as much as $25,000 a month to TBEG for routing services. Id. at 90:19 to 91:18.

### (2) Gelt Financial

Critical in this determination is the fact that Gelt Financial was hired by TBEG to assess the "value" of the toll free number to Champion, who determined that approximately 400 calls were made to the Number monthly and that each call had an approximate $50 value to Champion. The result of this mathematical equation, $20,000, is virtually identical to the ultimate $25,000 sum proposed by Champion and agreed upon by the parties, and the result of the mathematical equation in which Champion assigned a value of $1,250 for each of the 20 calls

14

resulting in loan funding is identical to the ultimately agreed upon $25,000 sum.  Accordingly, as in Jahn, the Agreement between Champion and BEG is nothing more than a transfer of a toll free number for value which constitutes a sale proscribed by the 1997 regulation.

### (3) The initial agreement Compared to the Agreement

TBEG argues that the Agreement was nothing more than a contract for routing services, but the record does not support this conclusion.  The obligations and responsibilities of TBEG changed little between the $1,200 payments under the initial agreement and the $25,000 Agreement payments.  This too is critical.  A review of the initial agreement and the Agreement reveals little difference in the obligations of TBEG, aside from the fact that the call territory for which the calls were to be routed increased.  Whether Champion was denied any interest rights or a license to the number, or that the offer to buy the Number was rejected, is irrelevant to the determination of whether this was or was not a sale.  If this in fact had been merely a routing contract, then the contract payments would not have been so markedly dissimilar and not so in line with the Gelt Financial assessment.  Accordingly, as argued by Defendant, this Court finds that TBEG was essentially receiving a financial benefit from each loan funded by Champion as a result of telephone calls to the number.  Accordingly, the Agreement encompassed the value of the Number and not merely the routing fees or services associated with the transfer of the calls. In fact, the routing fees and other services related charges appear to account for a minute portion of the $25,000 monthly payments.  Therefore, the Agreement rises to the level of a sale and is expressly the type of financial arrangement sought to be precluded by the FCC regulation.

**B.**     *The Effect of the 1998 Agreement*

In light of the above ruling that the Agreement constituted the 'sale' of a toll free number in contravention of 47 C.F.R. § 52.107(a), the Agreement between the parties is not a valid and enforceable contact as a matter of law. It is in fact illegal as it is in contravention of the regulation and therefore unenforceable. Because this is an illegal and unenforceable contract, this Court will not "aid or render any assistance to enforce" it. Lehigh Valley R. Co. v. United Lead Co., 102 N.J.L. 545, 550 (1926). Further, "as a general proposition, courts will not lend their assistance to either party to an illegal transaction which is void as contrary to public policy." New Jersey Bank v. Palladino, 146 N.J.Super. 6, 14 (1976).

Here, neither party comes to the table with clean hands. Both parties received what they bargained for. For about three years Champion's calls were routed to the Number and TBEG was paid for this endeavor without incident. It was only when, through a change of personnel, Champion realized they were overpaying and thus began to characterize the Agreement as an illegal contract. Once again, the Court emphasizes that both parties had the assistance of counsel and the benefit of negotiating a legal contract. At no time did Champion assert or rely upon the 1997 FCC prohibitive regulation. Accordingly, both parties shared equally, or were *in pari delicto* in their 'wrong' in forming the Agreement. Therefore, since payments made under contracts which are illegal and where the parties are *in pari delicto* may not ordinarily be recovered, the law leaves the parties where it finds them and gives no relief. Second Russian Ins. Co. v. Miller, 268 U.S. 552, 562 (1925) (citations omitted). Hence, while Champion is excused from the remaining $375,000 payments under the Agreement, they are not entitled to restitution of the prior payments.

16

## CONCLUSION

For the foregoing reasons, Defendant's *in limine* motion to Transfer to the FCC is denied.

Summary judgment is granted to Defendant as the Agreement constitutes an illegal contract and

is therefore void so that Defendant is excused from any further contract payments, but is not

entitled to restitution for past payments.


**SO ORDERED**


s/Susan D. Wigenton, U.S.D.J.

.